IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GENEVA INTERNATIONAL CORPORATION, | ) ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) No. 07 C 4214 ) |
| PETROF, SPOL, S.R.O. a Czech Republic corporation, | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

The parties each move for summary judgment as to Count I of the complaint, which involves a claim of anticipatory breach of licensing agreement arising out of an exclusive license (the license) granted by Petrof, Spol. S.R.O. (Petrof) to Geneva International Corporation (Geneva), to use the PETROF® trademark in the United States. Geneva further moves for a preliminary injunction barring Petrof from using its trademark in the United States to sell pianos until the expiration of the license in 2012. For the following reasons, both parties' motions are denied.

## BACKGROUND

The following facts are not in dispute. Geneva is an Illinois corporation that imports pianos for sale and distribution in the United States. Petrof is a manufacturer of pianos, and has its principal place of business in the Czech Republic. Since 1985 Geneva has been the exclusive U.S. distributor of pianos manufactured by Petrof and its predecessors in the Czech Republic, including pianos bearing the PETROF® trademark. In 2001, Geneva and Petrof's predecessor, Tovarna na piana, a.s., entered into a contract of exclusive sale. That contract

was amended on June 10, 2003. In the fall of 2003, through the spring of 2004, various disputes arose between the parties resulting in the commencement of arbitration proceedings in the Czech Republic, whose laws governed the amended contract. The parties entered into a settlement agreement on April 29, 2004, which was executed contemporaneously with the license and additional amendments to the contract for exclusive sale (this final iteration will be referred to simply as "the contract"). Enforcement of the settlement agreement was also contingent upon the execution of these other two documents. The license provided, in pertinent part:

> WHEREAS:
>
> B. On May 24, 2001, a contract of exclusive sale . . .was concluded between [Geneva] and Petrof's legal predecessor...which document was amended by the Parties on June 10, 2003 and today's date;
>
> C. On April 23, 2004, the Parties signed a term sheet on the basis of which they concluded a settlement agreement...;
>
> D. One of the terms and conditions to the effectiveness of the Settlement Agreement is the execution by the Parties of this Licensing Agreement through which [Geneva] will acquire an exclusive license to use the Mark solely and exclusively in the United States.
>
> NOW, THEREFORE, THE PARTIES HAVE AGREED AS FOLLOWS:
>
> 1. LICENSING OF THE MARK
>
> 1.1 For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Petrof grants [Geneva] an exclusive license to the mark within the territory of the United States of America from the date hereof through 31 December 2012...
>
> 1.2 [Geneva] hereby accepts the licensing of the Mark and agrees that, so long as a member of the Petrof family...owns a majority stake in and exercises control over Petrof and Petrof is still actively producing pianos, [Geneva] shall not use the Mark to sell pianos from other producers than Petrof.

2. FINAL PROVISIONS

2.1 This Licensing Agreement is made in accordance with and governed by the laws of the State of Illinois, United States of America...

\*\*\*

2.4 This Licensing Agreement constitutes the entirety of the agreement between the Parties with regard to the subject matter hereof and supersedes any previous agreement or agreements whether verbal or written with regard thereto.

An integration clause similar to that just mentioned in 2.4 above, was also laid out in the settlement agreement. The contract was amended to, among other things, expire on December 31, 2012, the same time as the license. The relevant provisions of the contract are as follows:

Section V - Buyer's obligations

\*\*\*

6. Supplier hereby grants to Buyer a non-exclusive, royalty-free license to use and have its dealers use the trademarks of Supplier for the promotion of the contractual products within the contractual territory; provided that Buyer and its dealers shall not have license to use Supplier's trademarks in any derivative manner including, without limitation, utilization of Supplier's name or other marks in connection with items or goods other than the contractual products. During the effectiveness and after the termination of this Contract, the Buyer shall not apply for registration of either Supplier's trade name or trademark registered for Supplier, or trademarks used with contractual products. Also, Buyer is not entitled to transfer any intellectual property right to third parties, in whole or in part, resulting from this Contract without the explicit and written approval of Supplier. Buyer shall notify Supplier without undue delay about any breach of trademark rights known to Buyer in the contractual territory

Section VI - Supplier's obligations

\*\*\*

2. Honor Buyer's rights of exclusive sales of contractual products in the contractual territory. Without limiting the generality of the foregoing sentence, Supplier shall not directly, or indirectly through third parties, sell or supply contractual products for sale in the contractual territory to any person or entity other than Buyer.

Section XIV - Withdrawal from the Contract [the Withdrawal Provision]

1. Each Party shall be entitled to withdraw from this Contract with six-month

prior notice in case of substantial infringement of obligations by the other Party.... The substantial infringement is understood to be mainly: (I) non-fulfillment of minimum annual purchases by Buyer per Section VIII; (ii) Supplier supplying contractual products directly, or indirectly through a third party, to another buyer in the contractual territory per Section VI.2 above; (iii) Buyer selling contractual products directly, or indirectly through a third party, beyond the contractual territory per Section V.8 above.

\*\*\*

4. If either of the Parties terminates the Contract in accordance with this Section XIV, and it is determined pursuant to arbitration initiated under Section XVI that such Party was not entitled to the premature termination, such arbitration decision will be accepted, and the non-terminating Party shall be entitled to require compensation of demonstrated damages for the improper, premature termination of the Contract.

By way of letters to Geneva dated February 23, 2007, and March 22, 2007, Petrof stated its intention to terminate the contract based, in part, on its belief that Geneva had failed to make the minimum purchases required in 2006. By letter dated May 21, 2007, Petrof notified Geneva that it was withdrawing from the Contract in accordance with Section XIV.1 and giving six months' notice. Since that time Petrof has publicly stated its intention to sell pianos in the United States bearing the PETROF® trademark. Geneva filed the present action alleging that Petrof's intention to begin distribution in the United States using the PETROF® trademark constitutes an anticipatory breach of the license.

## ANALYSIS

We have subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, and Petrof concedes that we also have personal jurisdiction over it. We apply Illinois law, as provided for in the choice-of-law provision of the license. Sound of Music Co. v. 3M, 477 F.3d 910, 915 (7th Cir. 2007).

Summary Judgment

Summary judgment is proper where the pleadings and evidence present no genuine

issue of fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (U.S. 1986). We evaluate admissible evidence in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Where, as here, both parties move for summary judgment, both are required to show that no genuine issues of fact exist, taking the facts in the light most favorable to the party opposing each motion. If issues of fact exist, neither party is entitled to summary judgment. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt, 700 F.2d 341, 349 (7th Cir. 1983). Where unambiguous, interpretation of a written contract is particularly amenable to summary judgment. Cherry v. Auburn Gear, Inc., 441 F.3d 476, 481 (7th Cir. 2006).

An anticipatory breach of contract occurs when a party to a contract "manifests a definite and unequivocal intent prior to the time fixed in the contract that it will not render its performance under the contract when that time arrives." Farwell Construction Company v. Ticktin, 84 Ill. App. 3d 791, 405 N.E.2d 1051, 1060, 39 Ill. Dec. 916 (1st Dist. 1980). The parties agree that Petrof has unequivocally stated its intent to begin selling its pianos in the United States using the PETROF® name (Geneva Stmt. of Facts ¶ 27). Therefore, the only question is whether or not the license, as written, permits them to do so.

Geneva argues that the term "exclusive license" in the license is unambiguous on its face, and thus we need not go beyond the four corners of the license to interpret it. Geneva sets forth Black's Law Dictionary's definition of the term, which defines "exclusive license" as "[a] license that gives the licensee the sole right to perform the licensed act, often in a defined territory, and that prohibits the licensor from performing the licensed act and from granting the right to anyone else; esp., such a license of a copyright, patent or trademark right."

BLACK'S LAW DICTIONARY 938 (8th ed. 2004). Generally, this would be the end of the matter. *See* Shields Pork Plus v. Swiss Valley Ag Serv., 329 Ill. App. 3d 305, 310 (Ill. App. Ct. 2002) ("if the contract terms are unambiguous, the parties' intent must be ascertained exclusively from the express language of the contract, giving the words used their common and generally accepted meaning")(citations omitted).

However, Petrof, while agreeing that the term "exclusive license" is unambiguous, insists that this court must read the license in conjunction with the contract and the settlement agreement, since they were executed on the same day as a single transaction, and the license and the amendments to the contract were conditions precedent to the effectiveness of the settlement agreement. Under Illinois law, "where different instruments are executed at the same time between the same parties, for the same purpose, and in the course of the same transaction, all of the instruments must be read and construed together." Sudeikis v. Chicago Transit Authority, 81 Ill. App. 3d 838; 401 N.E.2d 1114, 1117 (Ill. App. Ct. 1980). This is so "unless a contrary intention is manifested." Nelson v. John B. Colegrove & Co. State Bank, 354 Ill. 408, 413 (Ill. 1933).

There are several reasons why we would normally decline to read the license together with the other two documents. First, the license contains an integration clause, stating that it "constitutes the entirety of the agreement between the Parties with regard to the subject matter hereof and supersedes any previous agreement or agreements whether verbal or written with regard thereto." Second, the license is governed by the laws of the State of Illinois, while the settlement agreement and the contract are governed by the laws of the Czech Republic.

At the same time, all three documents were drafted by the parties and entered into on the same date. The settlement agreement cites to the contract and the license as "conditions

precedent" to the settlement agreement's enforcement. Additionally, the settlement agreement contains the same integration clause as the license, and yet the settlement agreement, by its own terms, relies on the contract and license for its enforcement. Finally, Section V.6 of the contract supplies Geneva with additional license obligations not found in the license itself.[1]

Petrof asks this court to hold that the term "exclusive license" cannot be interpreted to exclude Petrof itself from distributing its pianos under the PETROF® name in the United States because such a result would be commercially absurd in light of the contract.[2] *See* Call v. Ameritech Mgmt. Pension Plan, 475 F.3d 816, 821 (7th Cir. 2007) (If this 'literal' interpretation affronted the common sense of, or the economic realities behind [the contract,] that would be a powerful reason to reject it). In essence, Petrof appears to argue that the license did not limit Petrof's right to use the PETROF® trademark in the U.S. – according to Petrof, the term "exclusive license" was only intended to exclude any third party from using the trademark. Petrof asserts that the terms of the contract, not the license, are what prevented it from using the PETROF® name, and therefore, when Petrof withdrew from the contract based on its belief that Geneva had breached, the geographical restriction was also terminated and Petrof then had the right to use its trademark under the terms of the license. Petrof argues that to interpret "exclusive license" to exclude even Petrof would result in commercial absurdity because, since there is no similar termination provision in the license,

---

[1] This section was not deleted after the parties entered into the license. Some portions appear to contradict the terms of the license, *i.e.* Geneva's ability or inability to market products other than contractual products using the PETROF® trademark. To the extent that V.6 contradicts the license, we do use it to aid in our interpretation.

[2] Petrof also argues that we must interpret this term in light of "the general purposes and obligations which underlie trademark protection and [ ] licensing." (Petrof Brief at 4). We decline to do so, as this case is brought before us on an anticipatory breach of contract claim, not a trademark infringement claim under the Lanham Act. *See* Manning v. Galland-Henning Pneumatic Malting Drum Mfg. Co., 141 Wis. 199, 203 (Wis. 1910).

Geneva could effectively breach the contract and yet continue to hold the sole license to the PETROF® name in the U.S. for the next four years, even though it could no longer supply pianos under that name because the contract had been terminated. Petrof asserts that this could eventually result in a determination that the PETROF® trademark was abandoned through lack of use in the United States.

We agree with Petrof's conclusion, but not its premise. We find that the term "exclusive license" is not ambiguous. Contrary to Petrof's argument, reading the provisions of the contract and the license together demonstrates that Petrof did indeed intend to grant Geneva a license that excluded even Petrof from using the trademark for the duration of the contract. Petrof's obligations outlined in the contract confirm this:

> Supplier undertakes to...[h]onor Buyer's rights of exclusive sales of contractual products in the contractual territory. Without limiting the generality of the foregoing sentence, Supplier shall not directly, or indirectly through third parties, sell or supply contractual products for sale in the contractual territory to any person or entity other than Buyer.

Section XIV.1.ii permits Geneva to withdraw from the contract (with notice) in such an event.

Furthermore, Petrof's granting Geneva such a license does not necessarily result in a commercial absurdity. What makes Petrof's proffered scenario commercially absurd is not the interpretation of the term "exclusive license," but the fact that the license itself does not contain a termination provision in the event the contract is breached. Unless the contract and license are read as one, Geneva could breach the contract under circumstances outlined in the withdrawal provision, yet Petrof's withdrawal from the contract as a result of Geneva's breach would have no effect on Geneva's license of the PETROF® name, preventing all use of the

trademark in the United States for four more years.[3]

Geneva argues that the valuable consideration it paid in advance for the license requires a finding that the parties intended Geneva to have an exclusive license until 2012, regardless of any termination of the contract. Geneva asserts that this consideration includes its agreement to bring Petrof out of insolvency, for which it paid upwards of $850,000. However, the license itself does not reveal any specifics of the consideration paid, but merely states "for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged...." While we do acknowledge that the license was the result of consideration already paid, rather than a typical royalty payment structure, we do not find this, without more, sufficient to alter our holding.

We are aware of the limitations placed on reading contemporaneous contracts as one. Several courts have held that such a reading does not permit one contract to be imported wholesale into another, nor does it permit an unconditional contract to be made into a conditional one. *See* Suriano v. EMI Services Corp., 181 Ill. App. 3d 789 (Ill. App. Ct. 1989); Sterling Colorado Agency, Inc. v. Sterling Insurance Co., 266 F.2d 472 (10th Cir. 1959); Gov't Personnel Mut. Life Ins. Co. v. Wear, 247 S.W.2d 284 (Tex. App. Ct. 1952). However, we find the present case distinguishable because the contract itself discusses additional license obligations not found in the license, and construing the license as being entirely independent of the contract would result in commercial absurdity. Furthermore, the ultimate guide is the intention of the parties, and we find that construing both documents together evinces that intent most fully. Church v. General Motors Corp., 74 F.3d 795, 799 (7th Cir. 1996).

---

[3] As Petrof notes, under such a construction, had the alleged breach of the contract occurred shortly after the parties entered into license in 2004, Geneva could have excluded Petrof's use of its trademark for up to eight years.

We find that the contract's withdrawal provision applies to the license, such that a valid termination of the contract terminates the license.[4] What we do not presently know is whether or not Petrof's withdrawal from the contract was valid – an issue currently the subject of arbitration in the Czech Republic. If the result of the arbitration is that Geneva failed to meet its obligations, and Petrof's withdrawal was valid, then Petrof will not be liable for anticipatory breach by announcing its intentions to utilize its trademark in the United States. If arbitration results in a finding that Petrof's withdrawal was not warranted, Geneva may recover for anticipatory breach.

Preliminary Injunction

Geneva has moved for a preliminary injunction to prevent Petrof from beginning its use of the trademark in the United States. In order to obtain a preliminary injunction, the moving party must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has "no adequate remedy at law" and will suffer "irreparable harm" if preliminary relief is denied. If the moving party cannot establish either of these prerequisites, the court's inquiry is over and the injunction must be denied. If, however, the moving party clears both thresholds, the court must then consider, (3) the irreparable harm that the non-moving party will suffer if preliminary relief is granted, balanced against the irreparable harm to the moving party if relief is denied, and (4) the public interest, meaning the consequences of granting or denying the injunction to non-parties. Abbot Labs. v. Mead Johnson & Co., 971 F.2d 6, 11-12 (7th Cir. 1992).

---

[4] Geneva argues that since the terms of the contract already permit it to market PETROF® products exclusively in the United States, the license would have been superfluous if it did not grant Geneva an exclusive license that extends through 2012, irrespective of the limitations imposed by the contract. We do not agree. The license does not become superfluous when read in conjunction with the contract, because it overrides one of the contract provisions by permitting Geneva to use the PETROF® marks on non-contractual goods, in the event Petrof is not "still actively producing pianos."

Based on our foregoing analysis, we conclude that Geneva has demonstrated some likelihood of success on the merits of this case. Whether or not Petrof's conduct can be considered an anticipatory breach necessarily depends on whether Geneva was in breach of the contract, an issue not before this court. Both Geneva and Petrof have made numerous allusions to the other party's breaching conduct. Since we are unable to predict with any accuracy what the outcome of the Czech arbitration will be, it is possible, based on those assertions, that Geneva has some likelihood of success on the merits. Therefore, at this point, we find the first requirement satisfied.

However, Geneva fails to present this court with any evidence that it will be irreparably harmed by Petrof's use of its trademark in the United States. The president of Geneva, Earl Matzkin, offers a supporting affidavit, but it focuses almost entirely on the contract and merely glosses over the license. Further, Geneva fails to provide evidence that would raise its allegations of irreparable harm above the speculative level.

Geneva argues that unless an injunction is imposed, it will lose the good will of its retailers and its reputation in the industry will be irreparably damaged. Geneva asserts that it is known in the industry as the exclusive distributor and licensee of PETROF® products through 2012, and this "insurance of continuity is the cornerstone of the retailer-distributor relationship." (Plf. Brief at 9). Allowing Petrof to enter the market would cause confusion and uncertainty as to who can lawfully sell PETROF® pianos in the U.S., and irreparably damage Geneva's reputation and its relationship with retailers. Petrof counters that what is really the cornerstone of the distributor/retailer relationship is the ability to supply products, and regardless of whether Geneva retains the license, it can no longer supply PETROF® pianos to its retailers because Petrof has terminated the contract.

We agree with Petrof. Geneva's purported damages to its reputation and relationship with its retailers do not stem from the license as much as from the terms of the contract. As Petrof notes, enjoining it from entering the market will not result in it re-kindling the exclusive distributorship with Geneva. Petrof has consistently taken the position that that relationship is over and Geneva has not asked this court to enjoin Petrof's termination of the contract, nor could it as the contract is not before us. As such, license or no license, Geneva will not have PETROF® products to supply its retailers. The only possible damages we can conceive are those that would flow as a result of Petrof competing with Geneva, if Geneva, under the terms of the license, began marketing non-Petrof made pianos under the PETROF® trademark. However, if Geneva were to do so while Petrof was still actively producing pianos, Geneva itself would be in breach of the license barring it from recovering damages. On the other hand, if Petrof were not actively making pianos, Geneva would not suffer damages because Petrof obviously would not be competing with it in the market. Since Geneva is unable to demonstrate specific irreparable harm that flows from Petrof's contrary actions under the terms of the license, rather than the contract, Geneva has not met its burden.[5]

Because Geneva fails to demonstrate irreparable harm, we need not continue to analyze the remaining factors. <u>Adams v. City of Chicago</u>, 135 F.3d 1150, 1154 (7th Cir. 1998). However, giving them cursory review we find that they further support our denial of an injunction. Obviously, since we found Geneva fails to demonstrate irreparable harm, any

---

[5] Geneva also argues that it will be irreparably harmed because any money damages flowing from Petrof's breach will not be recoverable due to Petrof's precarious financial position, or the damages will come too late to save Geneva's business. True, the Standstill agreement Petrof entered into with its creditors does state that any amount claimed against Petrof in excess of 5,000,000 Czech Koruna (approximately $280,000) would trigger the full collection of Petrof's outstanding debts, likely leaving little or nothing for Geneva in such an event. However, as noted above, Geneva is unable to demonstrate any harm that would flow specifically from the license, let alone $280,000 worth. This, therefore, is not sufficient evidence of irreparable harm.

balancing of harms would weigh in favor of Petrof. Furthermore, Petrof provides evidence that in anticipation of entering the U.S. market, it has already hired U.S. sales representatives who left other well-paying positions to work for Petrof, reserved exhibition space in connection with a national trade show in January, arranged to ship products there, leased office space and arranged for other incidentals. If Petrof is enjoined from using its trademark in the U.S., it will not only be harmed monetarily, but also by way of damage to its reputation in the industry. Therefore, the balance of harms weighs in favor of Petrof. Finally, we find no real public interest implicated in this case. Northwest Bakery Distributors, Inc. v. George Weston Bakeries Distribution, Inc., No. 04 C 8233, 2005 WL 66044 (N.D. Ill. Jan. 11, 2005). While there is an interest in seeing that parties follow through on their contractual obligations (SMC Corp. v. Lockjaw, LLC, 481 F. Supp. 2d 918, 929 (N.D. Ill. 2007)), we do not know whether any obligations still exist under the terms of the license and will not know until arbitration in the Czech Republic is complete. That should be relatively soon, and the arbitration decision may lead to a reconsideration of the parties' relationship. For now, however, consideration of these remaining factors supports our conclusion that an injunction is not warranted in this case.

## CONCLUSION

For the foregoing reasons, both plaintiff's and defendant's motions for summary judgment are denied. Plaintiff's motion for a preliminary injunction is similarly denied.

JAMES B. MORAN
Senior Judge, U. S. District Court

Dec. 14, 2007.