IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GENEVA INTERNATIONAL CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | No. 07 C 4214 |
| PETROF, SPOL, S.R.O. a Czech Republic corporation, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Geneva International Corporation and defendant Petrof, Spol, S.R.O. both previously moved for partial summary judgment as to Count I of plaintiff's complaint, which is a claim of anticipatory breach of a licensing agreement granting plaintiff the exclusive license to the PETROF® trademark in the United States. This court denied both parties' motions (see December 14, 2007, Memorandum Opinion and Order) (Order). Currently before this court is plaintiff's renewed motion for summary judgment, or in the alternative, for partial reconsideration of the court's order. For the following reasons, we enter a Rule 56(d) order which deems established defendant's liability to plaintiff for anticipatory breach of the license.

### Undisputed Facts[1]

We will assume familiarity with the facts laid out in our previous Order, and will focus on the facts relevant to the renewed motion.

Plaintiff is an Illinois corporation with its principal place of business in Illinois.

---

[1] Although defendant admits that these facts are true, it argues that some of them are inadmissible.

Defendant is a manufacturer of pianos, with its principal place of business in the Czech Republic. Plaintiff imports, among other things, pianos made in the Czech Republic, which it sells throughout the United States under the PETROF® trademark. From 1985 until December 2007, plaintiff was the exclusive distributor within the United States of pianos manufactured by Petrof and its predecessors. Defendant's sales to plaintiff during that time period exceed $80 million (plf. L.R. 56.1(a) amended stmt. of material facts ¶ 6) (plf. SOF).

In January 2004, the parties became embroiled in a series of disputes that began when defendant notified plaintiff of its intent to withdraw from the parties' 2001 Contract of Exclusive Sale (contract), claiming that plaintiff had materially breached the contract (*id.* at ¶ 12). The parties' disputes resulted in their filing cross-petitions for relief in the Czech Arbitration Court, pursuant to the procedure specified in the contract.

Also in early 2004, defendant was facing severe cash-flow problems. On April 9, 2004, defendant's employee, Said Tabet, wrote to plaintiff that the employees at Petrof's factory would not be paid, and that they had threatened to strike (*id.* at ¶ 16-17). On April 28, 2004, plaintiff received a letter from Petrof's president, Zuzana Ceralova Petrofova, in which she asked for defendant's "financial support in the near few days, as soon as possible, even end of this week" (*id.* at ¶ 30). She also sent plaintiff a list of debts defendant owed, and said that one of defendant's lenders had blocked the accounts of Tyniste Piano, one of its affiliates. At some point defendant temporarily ceased production of its pianos, and Petrofova wrote in the April 28 letter, "Only with your help can we restart production" (*id.* at ¶ 32).

During this time the parties engaged in discussions aimed at settling their disputes. The settlement negotiations included defendant paying some of plaintiff's debts, and defendant granting plaintiff an exclusive license to utilize the PETROF® trademark in the United States

through December 31, 2012. Petrof agreed to license the PETROF® trademark "[u]nder a separate agreement" (*id.* at ¶¶ 25, 28).

In response to a draft license agreement that plaintiff's lawyer had sent to defendant on April 28, 2004, Tabet proposed adding a sentence that read, "Licensing agreement will be terminated in case of lawful withdrawing of the contract of exclusive sale or expiration of the contract of exclusive sale before December 31, 2012" (*id.* at ¶ 37). After a series of phone calls between the parties in which the draft agreement was discussed, plaintiff's attorney sent a revised version of the license to defendant's attorney that did not contain the termination provision Tabet had proposed, nor any provision by which the parties could terminate the license prior to its December 31, 2012 end date. The revision also altered defendant's choice-of-law and choice-of-forum provisions from Czech law and its courts to Illinois law and its federal and state courts (*id.* at ¶ 43). On April 29, 2004, the parties signed this version of the license and several other agreements, including a settlement agreement under which the parties agreed to withdraw their petitions from the Czech Arbitration Court.[2] The execution and delivery of the license, amendment, and trademark assignment agreements were conditions precedent to the settlement agreement becoming effective (the agreements signed on this date will be referred to collectively as the "April 2004 agreements").

Starting on May 6, 2004, and continuing through the weeks that followed, plaintiff made a series of wire transfers from its bank account to an account in the Czech Republic to repay certain debts defendant owed (plf. L.R. 56.1(b) stmt. of add'l facts, Oct. 9, 2007, ¶¶ 16-25). These wire transfers totaled more than $800,000 (*id.*).

---

[2] The other agreements signed that day included an amendment to the contract which, among other things, extended the contract to December 31, 2012; an assignment of another Petrof trademark to plaintiff, which is not relevant to the current dispute; and an agreement between plaintiff and Petrofova for the provision of services, under which Petrofova agreed to help market defendant's pianos in the United States.

On or about February 23, 2007, and March 22, 2007, defendant notified plaintiff that it intended to terminate their contract, based in part on its belief that plaintiff had failed to make the minimum purchases required in 2006. It also stated that it intended to terminate plaintiff's exclusive distributorship, and that in December 2007 it would begin selling pianos in the United States with the PETROF® trademark. It is now selling, or attempting to sell, PETROF® pianos through its subsidiary, Petrof USA, LLC (plf. SOF ¶ 70).

In our earlier order we found that the parties intended for the contract's withdrawal provision to apply to the license. Therefore, if defendant's withdrawal from the contract in 2007 was valid, then it would also have effected a termination of the license and no anticipatory breach would have occurred (Order, p. 5). Plaintiff claims that if the court had been aware of the negotiations surrounding the April 2004 agreements, it would have understood that the parties did not intend for the contract's withdrawal provision to apply to the license. Plaintiff now submits evidence of these negotiations, and makes its renewed motion for partial summary judgment or, in the alternative, reconsideration of the Order, on the basis of this expanded record.

## Discussion

Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The court must evaluate admissible evidence in the light most favorable to the non-moving party, and may not make credibility determinations or weigh evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The party who bears the burden of proof on an issue may not rest on the pleadings or mere speculation, but must demonstrate affirmatively that there is no genuine issue of material fact

that requires a trial to resolve. <u>Celotex Corp.</u>, 477 U.S. at 324. The interpretation of a contract is particularly amenable to summary judgment because, absent contractual ambiguity, it is a matter of law. <u>Automation by Design, Inc. v. Raybestos Prod. Co.</u>, 463 F.3d 749, 753 (7th Cir. 2006).

It is within the trial court's discretion to deny a motion for summary judgment without prejudice to its being renewed at a later time, and the court may grant a renewed motion upon a showing of good cause. 10A Wright, Miller & Kane, <u>Federal Practice and Procedure</u> § 2716 (3d ed. 1998). This court has authority to reconsider a prior denial of summary judgment because it is an interlocutory decree with no *res judicata* effect. <u>Whitford v. Boglino</u>, 63 F.3d 527, 530 (7th Cir. 1995). A renewed or successive summary judgment motion is especially appropriate if one of the following grounds exists: (1) an intervening change in controlling law; (2) the availability of new evidence or an expanded factual record; or (3) a need to correct a clear error or prevent manifest injustice. *Id.* (citations omitted).

A license to use a trademark is a contract, and disputes over the language of a trademark license are governed by the rules of contract interpretation. <u>Intersport, Inc. v. Nat'l Collegiate Athletic Ass'n</u>, 885 N.E.2d 532, 538 (Ill. App. 1 Dist. 2008). The court's primary objective in interpreting a contract is to determine and give effect to the intent of the parties, so long as it does not conflict with any rule of law or public policy. <u>Gallagher v. Lenart</u>, 874 N.E.2d 43, 58 (Ill. 2007).

## I. Whether Plaintiff's Parol Evidence May be Considered

The parol evidence rule dictates that when an integrated contract's terms are clear and unambiguous, the court must give those words their ordinary and natural meaning, and evidence of a prior or contemporaneous agreement is not admissible to vary the terms.

<u>Foxfield Realty, Inc v. Kubala</u>, 678 N.E.2d 1060, 1063 (Ill. App. 2 Dist. 1997). As stated in our earlier order, and as the parties agree, the term "exclusive license" is not ambiguous (Order, p. 6). We found that the parties intended the license to exclude even defendant from using the trademark in the United States until 2013. Neither party has suggested that these findings should be altered.[3] They therefore remain the law of the case.

Although parol evidence may not be offered to vary a contract's terms, the Illinois Supreme Court has stated that parol evidence is permitted to explain the meaning of even a fully integrated agreement in cases in which the Uniform Commercial Code governs. <u>McMahon Food Corp. v. Burger Dairy Co.</u>, 103 F.3d 1307, 1314 (7th Cir. 1996) (applying Illinois law), *citing* <u>J & B Steel Contractors, Inc. v. C. Iber & Sons, Inc.</u>, 642 N.E.2d 1215, 1219 (Ill. 1994). In such cases, courts use the more lenient approach articulated in the Restatement (Second) of Contracts § 214(c), which states, "Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . the meaning of the writing, whether or not integrated."

In our earlier order we did not address whether plaintiff's claim for anticipatory repudiation falls under the UCC as incorporated into Illinois law, *see* 810 ILCS 5/2-610 (West 2000).[4] Since this analysis is required to determine whether we may consider parol evidence

---

[3] Since we do not disturb this finding, defendant's contention that it did not understand the license to exclude Petrof itself from using the PETROF® trademark in the United States is irrelevant.

[4] Sec. 2-610 states:
Anticipatory Repudiation. When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may (a) for a commercially reasonable time await performance by the repudiating party; or (b) resort to any remedy for breach (Section 2-703 or Section 2-711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and (c) in either case suspend his own performance or proceed in accordance with the provisions of this Article on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (Section 2-704).

in interpreting the license, we address that issue here.

The UCC governs contracts for the sale of goods. When a contract is "mixed," *i.e.*, it is for the sale of both goods and services, the test in Illinois is which purpose predominates. Ryan v. Wersi Electronics GmbH and Co., 3 F.3d 174, 181 n. 3 (7th Cir. 1993) (applying Illinois law). If the contract is predominantly for the sale of goods, with services being incidental, the contract will be governed by Article 2 of the UCC. Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc., 770 N.E.2d 177, 194-5 (Ill. 2002). But if the contract is predominantly for services, with the sale of goods being incidental, the contract will not fall within Article 2. *Id.*

"Distributorship agreements . . . are frequently though not always classified as UCC contracts under the predominant-purpose test." Monetti, S.P.A. v. Anchor Hocking Corp., 931 F.2d 1178, 1184 (7th Cir. 1991) (applying Illinois law) (contract for exclusive distribution rights, which included specified minimum purchases of goods, deemed a contract for the sale of goods where the amount in sales contemplated "swamped" the intangibles associated with the former distributor's operation). In WICO Corp v. Willis Industries, the parties signed two agreements granting the plaintiff an exclusive distributorship of the defendant's graphics, including a provision allowing use of the defendant's trademarks. 567 F. Supp. 352, 353 (N.D. Ill. 1983) (applying Illinois law). The agreements also required the plaintiff to undertake certain promotional obligations, like advertising. The court determined that the contracts, while containing obligations related to both goods and services, were predominantly for the sale of goods because the sales were "the raison d'etre" of the agreements. Therefore, they

---

The official UCC Comment explains that "anticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." *Id.*, cmt. 1. After repudiation, the non-breaching party may resort to any remedy he chooses "provided he moves in good faith." *Id.*, cmt. 4.

were governed by the UCC. *Id.* at 355. *See also* Belleville Toyota, 770 N.E.2d at 194 (car

dealer and distributor agreement predominantly a contract for the sale of goods); Ryan, 3 F.3d

at 181 (exclusive distributorship for sale of musical instruments was a mixed contract, but

predominantly a contract for the sale of goods). In contrast, in a case where a non-exclusive

license allowed a software developer to use a typeface in its software, the license was not a

contract for the sale of goods because no "sale" in the sense of a transfer of title was involved.

Berthold Types Ltd. v. Adobe Systems, Inc., 101 F. Supp. 2d 697, 698 (N.D. Ill. 2000).

Here, the license governs the terms under which plaintiff may use defendant's

trademark to sell pianos in the United States. Like the agreements in WICO, the "raison

d'etre" of the license is for the sale of goods. Moreover, until 2004 the licensing provisions

were incorporated into the parties' contract, which is unquestionably a contract for the sale

of goods. Renegotiating the license as a separate agreement does not change its predominant

purpose. We therefore find that the predominant purpose of the license is the sale of goods,

and it is therefore governed by the UCC. Accordingly, we are not prevented from considering

the parol evidence proffered by the parties. McMahon, 103 F.3d at 1314.[5]

The undisputed evidence of the negotiations of the license reveals that the parties

intended for the termination provision in the contract not to apply to license. Tabet's April

28 proposal contained a provision explicitly providing for the termination of the license in the

event of a lawful withdrawing from the contract before the license's end date. Plaintiff sent

a revised version that omitted this provision. When plaintiff sent this revision, it was implicitly

rejecting defendant's offer by submitting a counteroffer. *See* Finnin v. Bob Lindsay, Inc., 852

---

[5] An additional basis under which we may consider parol evidence is that the under the rule, extrinsic evidence is admissible when not offered to vary or modify the unambiguous provisions of a contract. Evans v. Lima Lima Flight Team, Inc., 869 N.E.2d 195, 202 (Ill. App. 1 Dist. 1997). Since the license contains no provision providing for its termination prior to the end date, plaintiff's evidence is not being offered to vary its terms.

N.E.2d 446, 450 (Ill. App. 3 Dist. 2006) (the plaintiff, in crossing out certain terms of an agreement proposed by the defendant, then signing and sending it to him, rejected the defendant's offer and made a counter-offer). When defendant signed the license as revised by plaintiff, it manifested its acceptance of plaintiff's counter-offer. We therefore find that the parties intended for the contract's termination provision not to apply to the license.

Defendant offers an alternative explanation for the omission: "It is equally plausible that GIC shared Petrof's (and the Court's) view that the additional language was unnecessary to clarify the parties' intent, and did not want to further delay execution or incur the additional attorneys' fees required to conform the package of five agreements being presented for execution at that time" (def. sur-reply, p. 2). But this explanation, unsupported by any citation to legal authority or defendant's proffered facts, is speculative and insufficient to create a question of material fact. Even disregarding the phone calls between the parties and their attorneys during the negotiations (which we are obligated to do on summary judgment because the content of those conversations is disputed), the parties manifested their mutual assent to the license by signing the version last proposed by plaintiff. This is the most critical material fact, and it is not in dispute.[6]

## II. Whether the April 2004 Agreements Should be Construed as a Single Instrument

As stated in our earlier order, a court must consider the long-standing principle that when "different instruments are executed together as part of one transaction or agreement,

---

[6] Defendant also argues that the averments of two of plaintiff's employees that they discussed the license by telephone with defendant on April 29 are "fatally inconsistent" because they would have taken place after the e-mail they purportedly sent to their attorney summarizing the conversations (plf. exhs. B, E). As plaintiff explains, it made an immaterial error in typing April 29, instead of April 28, as a result of the time difference between the United States and the Czech Republic. Plaintiff subsequently amended those declarations to reflect that the conversations took place late on April 28 in the United States, which was April 29 in the Czech Republic. Defendant's hyperbole in making this argument is unavailing and quite simply a waste of the court's time.

they are to be read together and construed as constituting but a single instrument." <u>IFC Credit Corp. v. Burton Industries, Inc.</u>, 536 F.3d 610, 614-615 (7th Cir. 2008) (applying Illinois law), *citing* <u>McDonald's Corp. v. Butler Corp.</u>, 511 N.E.2d 912, 917 (Ill. App. 2 Dist. 1987). This is so in the "absence of evidence of contrary intention." <u>Tepfer v. Deerfield Savings & Loan Assn.</u>, 454 N.E.2d 676, 679 (Ill. App. 1 Dist. 1983). "Construing contemporaneous instruments together means simply that if there are any provisions in one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect." *Id.*

Based on the expanded record now before the court, we believe that the parties intended to treat the termination provisions under the license and contract as separately enforceable, even though the license and amendment to the contract were executed at the same time. *See* <u>Thread & Gage Co., Inc. v. Kucinski</u>, 451 N.E.2d 1292, 1296 (Ill. App. 1 Dist. 1983). Even if the contract and license are construed together, that does not mean that the terms of the contract should be imported into the license, especially where, as here, there is evidence to the contrary. *See* <u>Suriano v. EMI Svcs. Corp.</u>, 537 N.E.2d 836, 840 (Ill. App. 1 Dist. 1989) (nothing in the parties' stock purchase agreement contradicted the purchaser's unconditional obligation to repay loan in loan agreement that was simultaneously executed). The terms of the license – specifically the termination provision, choice-of-law and choice-of-forum provisions, and integration clause – indicate that the parties did not want the terms from the other agreements to be read into the license.

As discussed above, defendant's proposal to include a sentence linking the termination provision in the contract to the license was rejected. Similarly, Tabet's proposed version of

the license called for Czech law to govern and for an "Arbitrational clause."[7] Plaintiff rejected

that provision, and the revision it proposed specified that Illinois law would govern and that

federal and state courts sitting in Illinois would have exclusive jurisdiction over any disputes

arising under the license. This differs from the settlement agreement, amended contract, and

agreement on the provision of services, which stipulate that Czech law governs and that Czech

courts will have jurisdiction over disputes. The inclusion of an integration clause bolsters the

conclusion that the parties did not intend for the provisions of the contract to be read into the

license. *See* Air Safety, Inc. v. Teachers Realty Corp., 706 N.E.2d 882, 885-886 (Ill. 1999),

*quoting* Armstrong Paint & Varnish Works v. Continental Can Co., 133 N.E. 711, 713 (1921)

(an integration clause is used to express the parties' desire that they be "conclusively bound

by the terms of the agreement as expressed in the writing").

We believe that the cases in which multiple agreements were used to interpret one

another are distinguishable from the case here. In Intersport, which defendant cites, the

plaintiff had entered into an exclusive perpetual licensing agreement with the defendant to use

the "March Madness" mark. The parties simultaneously entered into a perpetual marketing

and representation agreement. 885 N.E.2d at 535. In holding that the plaintiff could use the

license to distribute content with the mark to video-enabled cell phones, even though that use

was not explicitly provided for in the license, the court noted that the plaintiff's obligations

under the marketing agreement helped bolster the case for reading the license to include video.

*Id.* at 542.

In IFC, the parties signed two agreements related to the defendant's leasing certain

---

[7] Presumably this is a reference to the clause found in other agreements between the parties, which stipulates that "any and all disputes" arising under the agreement shall be resolved in the Arbitration Court of the Economic Chamber of the Czech Republic and the Agricultural Chamber of the Czech Republic, in accordance with those bodies' rules.

telecommunications equipment. 536 F.3d at 612. One agreement stated that the other agreement, regarding equipment rental, would not be binding until certain conditions were met. When the defendant failed to make payments because one of these conditions was not met by the lessor, the lessor sued. The court found that the two agreements had to be read together because the parties had agreed to certain conditions precedent to the formation of the equipment rental lease. Since the conditions were not all met, neither agreement was consummated. *Id.* at 614.

Like the equipment rental agreement in IFC, the settlement agreement in this case did not become effective until certain conditions were met, specifically the execution and delivery of the amendment, license, and trademark assignment (Matzkin decl., exh. I). But in both Intersport and IFC, the party claiming that the agreements should be interpreted together was referring to agreements that were all executed simultaneously. Defendant urges us to construe the 2001 contract with the April 2004 agreements because the contract was amended on that date. While it is true that reading the amendment separately from the contract would make little sense, we believe that extending this linkage to all the April 2004 agreements ignores the reality of the circumstances at that time. In 2004, unlike 2001, defendant needed plaintiff's significant financial support to pay off its creditors. Plaintiff negotiated certain concessions in exchange for its financial support, including an exclusive, non-terminating license through 2012. Based on these circumstances, it would be inappropriate to graft provisions from the contract onto the license. Moreover, given the evidence of the parties' negotiations, reading the contract's termination provision into the license would require us to add a provision to the license. We may not do this, even if it makes the contract more equitable. Intersport, 885 N.E.2d at 543. Accordingly, we find that the parties did not intend the termination provision

to apply to the license.

## III.  Whether the License is Commercially Absurd Without the Termination Provision

In our previous order we found the fact that the license did not contain a termination provision rendered the license commercially absurd because of the potential consequences of a breach of the contract by plaintiff: "Unless the contract and license are read as one, Geneva could breach the contract under circumstances outlined in the withdrawal provision, yet Petrof's withdrawal from the contract as a result of Geneva's breach would have no effect on Geneva's license of the PETROF® name, preventing all use of the trademark in the United States for four more years" (Order, pp. 8-9). The expanded record demonstrates that the parties understood the possibility of this scenario, and decided to move forward anyway.

There is a "strong presumption" that written contracts are to be enforced in accordance with the ordinary meaning of their language. Beanstalk Group, Inc. v. AM General Corp., 283 F.3d 856, 859 (7th Cir. 2002). However, "a contract will not be interpreted literally if doing so would produce absurd results, in the sense of results that the parties, presumed to be rational persons pursuing rational ends, are very unlikely to have agreed to seek." Id. at 860. This principle of interpretation must be used cautiously, however, because "there is always a danger that what seems commercially unreasonable to a court did not seem so to the parties." XCO Int'l, Inc. v. Pacific Scientific Co., 369 F.3d 998, 1005 (7th Cir. 2004).

In XCO, XCO sold several patents on heat-sensitive cables to PacSci, which PacSci then licensed back to XCO for a specific use. Id. at 1000. After the contract was signed, XCO began manufacturing a different type of heat-sensitive cable, for which it applied for a patent. PacSci argued that, under a proprietary-rights clause in the contract, XCO had to pay it royalties on this new invention. Id. at 1005. The court found that PacSci's interpretation

would require XCO to give up all its future inventions for the entire 12-year life of the contract, a commercially unreasonable result for an inventor like XCO. The court said that if PacSci had produced evidence that the consideration it gave XCO for the patents was so generous in relation to the prospects of XCO's business that it was surely intended to cover future inventions, it might not have determined that its interpretation was commercially unreasonable. Since PacSci failed to do so, however, the Seventh Circuit rejected its claim as "implausible." *Id.*

Plaintiff here has done what PacSci failed to do, *i.e.*, produced evidence that the consideration it gave defendant was so generous that the license was not intended to terminate until 2013, even in the event of a lawful withdrawal from the contract. Indeed, Petrofova implored plaintiff that "[o]nly with your help can we restart production." It does not seem commercially unreasonable to accede to plaintiff's demands regarding this license in exchange for the ability to stay in business.

The expanded record also shows the parties entered into the license willingly. It is not the court's role to alter a contract where the parties have shown "poor judgment." Beanstalk, 283 F.3d at 865 (Rovner, J., dissenting in part). "[W]e do not normally protect parties from the consequences of entering into bad deals except when the contract is unconscionable and the party being held to it is unsophisticated." *Id.* Defendant here has not claimed that the license was unconscionable. But if it had made this argument it would likely not succeed since it had been represented by counsel, had been in business for many years, and had had a contractual relationship with plaintiff since the 1980s.[8] We therefore find that interpreting the

---

[8] Further, as plaintiff notes, defendant could sue plaintiff in Czech court in the event plaintiff breached the contract. It would therefore not necessarily be the case that neither party could use the trademark in the United States for the duration of the license.

license without the contract's termination provision does not produce a commercially absurd result.[9]

## IV.  Whether the License Risks Abandonment of the PETROF® Trademark

Defendant's final argument is that if the license is viewed in isolation, defendant risks abandoning the trademark because the license contains no provisions specifying how it will ensure the quality of plaintiff's distribution operations.  Since all the quality assurance provisions are in the contract,[10] defendant claims, reading the license alone "would impute an intention to the parties to abandon the trademark and permit anyone to utilize the PETROF® mark" (def. response to plf. mot for summ. judg., p. 9).  This argument misses the mark.

A trademark serves as an indicator of origin, assuring customers that the goods and services sold under the trademark are of a uniform nature and quality.  Draeger Oil, Inc. v. Uno-Ven Co., 314 F.3d 299, 301 (7th Cir. 2002).  When a trademark holder licenses its mark to a third party, it has a duty to control the quality of the trademarked goods or services.  Gorenstein Enterprises, Inc v. Quality-Care-USA, Inc., 874 F.2d 431, 435 (7th Cir. 1989).  "If a trademark owner allows licensees to depart from its quality standards, the public will be misled, and the trademark will cease to have utility as an informational device."  TMT North America, Inc. v. Magic Touch GmbH, 121 F.3d 876, 885 (7th Cir. 1997), citing Kentucky Fried Chicken Corp v. Diversified Packaging Corp., 549 F.2d 368, 387 (5th Cir. 1977).  When this happens, a trademark-holder may involuntarily abandon the mark through so-called "naked" licensing.

---

[9] Since we hold that the parties did not intend for the termination provision in the contract to apply to the license, we need not consider the Czech Arbitration Court's findings in determining the parties' rights and liabilities under the license.

[10] The quality control provisions defendant points to in the contract are §§ V.7 (plaintiff's duty to have its dealers carry out "advance service" of contractual products), XIV (withdrawal from the contract), and XV (claims procedure).

When a trademark is licensed, a licensor, by definition, relinquishes some loss of control over product quality. As long as the licensor maintains "reasonable control" over the product's quality, however, it does not forfeit its trademark rights through licensing agreements. *Id.* at 886. In cases where the parties have a "close working relationship," adequate quality control may be established in the absence of a formal agreement. Bancamerica Int'l USA Trust v. Tyfield Importers, Inc., 289 F.3d 589, 597 (9th Cir. 2002) (collecting cases). In Bancamerica the defendant argued that the plaintiff had abandoned its rights to the "Da Vinci" mark for wine after it granted an exclusive license to a winemaker but made minimal efforts to control the quality of the wine. Finding that the plaintiff and the winemaker did not have a close working relationship, written quality control provisions, or an actual quality control regime, the Ninth Circuit held that the plaintiff had abandoned the mark. *Id.* at 597-598.

It is true that the license in this case contains no specific provisions for how defendant will exercise quality control over plaintiff's distribution of PETROF® pianos. But plaintiff had sold defendant's pianos for nearly two decades when the license was signed, and defendant does not dispute that the parties had a close working relationship (in fact, defendant drops the naked licensing argument altogether in its sur-reply). We find, therefore, that no formal agreement was needed to ensure adequate quality control over the PETROF® mark. Indeed, in this case it appears the quality concerns were more on plaintiff's end, as the amendment provided that plaintiff's designated employee or agent could be on-site at defendant's production facilities "to effectively oversee and influence the quality of the production of the pianos earmarked for it under this Contract" (Matzkin decl., exh. K).

None of the cases defendant cites persuades us that this issue rises to a level of triable

material fact.  <u>TMT</u> involved a dispute over which of two companies owned certain trademarks. In <u>Westco Group, Inc. v. K.B. & Assoc., Inc.</u>, the dispute centered on the ability of a licensee to pursue a naked licensing defense. 128 F. Supp. 2d 1082, 1088-1089 (N.D. Ohio 2001).  And <u>Bancamerica</u>, discussed *supra*, works against defendant's argument that the contract and license must be read together given the parties' close working relationship. Defendant's naked licensing concerns, therefore, do not preclude our finding in plaintiff's favor on the issue of defendant's liability.

### V.  Rule 56(d) Order

Based on the foregoing, we believe it is appropriate to enter an order pursuant to Fed.R.Civ.P. 56(d) for partial summary adjudication on the issue of defendant's liability, but not as to the amount of damages.  Rule 56(d) permits the court to enter an interlocutory summary judgment order where there is a genuine issue as to damages but not as to the ultimate liability of the non-moving party.  10B Wright, Miller & Kane, <u>Federal Practice & Procedure</u> § 2736 at 306 (3d ed. 1998).  "The purpose of [the rule] is twofold: to salvage some of the judicial effort involved in the denial of a motion for summary judgment and to streamline the litigation process by narrowing the triable issues." <u>Republic Tobacco, L.P. v. North Atlantic Trading Co., Inc.</u>, 254 F. Supp. 2d 985, 997 n. 13 (N.D. Ill. 2002).

Plaintiff has demonstrated that it suffered damage as a result of defendant's breach after it announced it would begin selling pianos under the PETROF® trademark in the United States (plf. reply in support of mot. for summ. judg., exhs. 1-2).  Since plaintiff has not sought summary judgment on the amount of its damages, however, that issue remains for trial.

### Conclusion

For the foregoing reasons, plaintiff's renewed motion for summary judgment on Count

I is denied, but a Rule 56(d) order is hereby entered, which deems established defendant's liability to plaintiff for anticipatory breach of the license. These proceedings will continue to trial on the amount of damages.

JAMES B. MORAN
Senior Judge, U. S. District Court

April 14 , 2009.